UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                             :

FRANKLIN TUCKER,                  :
                             :

                Plaintiff,      :
                             :         05 Civ. 2804 (GEL)
      -v.-                      :
                             :        **OPINION AND ORDER**

NEW YORK CITY; NEW YORK CITY  :
DEPARTMENT OF EDUCATION;    :
JOEL KLEIN, in his official capacity and  :
as an aider and abettor,       :
                             :

                Defendants.  :
                             :
-------------------------------------------------------------x

Franklin Tucker, Gaithersburg, MD, pro se.

Michael A. Cardozo, Corporation Counsel of the City
of New York, New York, NY, by Joshua R. Fay,
Assistant Corporation Counsel, for defendants.

GERARD E. LYNCH, District Judge:

        Plaintiff Franklin Tucker brings this action alleging that his former employer, the New

York City Department of Education ("DOE"), discriminated against him on the basis of his race,

national origin, and disability, and retaliated against him for complaining about race

discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et

seq. ("Title VII"), 42 U.S.C. §§ 1981, 1985, the Americans with Disabilities Act, 42 U.S.C. §

12131, et seq. ("ADA"), and New York State and City Human Rights Laws.  Plaintiff also

asserts a claim under 42 U.S.C. § 1983, alleging that the DOE retaliated against him for speaking

out on matters of public concern in violation of the First Amendment.  Both plaintiff and

defendants have moved for summary judgment on all claims.  Defendants' motion for summary

judgment will be granted, and plaintiff's motion denied.

# BACKGROUND

The following facts are either undisputed, or are taken in the light most favorable to plaintiff.

In September 1997, Franklin Tucker, who is African-American, was hired by the New York City Department of Education[1] to serve as an interim-acting Director of Alcohol and Substance Abuse Programs ("Drug Director") in Community School District Five. (Declaration of Joshua Fay, dated March 20, 2008 ("Fay Decl."), Ex. C.) Tucker worked as an interim-acting Drug Director until he was laid off on September 1, 2003.

When he was hired, Tucker signed a form acknowledging that he was aware "that [he] will not accrue any rights to this position based on [his] interim-acting service" and that his services could terminate upon the selection of a non-interim supervisor or at the DOE's discretion. (Fay Decl., Ex. C.) The form also stated that Tucker was "aware that [he] will not accrue any rights to this position based on [his] interim-acting service." (Id.)

The DOE hires its administrative and supervisory personnel, including its Drug Directors, through a process known as Chancellor's Regulation C-30. (Fay Decl., Ex. D.) Pursuant to Regulation C-30, the DOE publicly posts its job openings. (Id. 4.) At the close of the posting period, the DOE Division of Human Resources must certify the applicant pool. (Id. 9.) An applicant pool may be certified if there is a sufficient minimum number of applicants, as well as racial and gender diversity within the applicant pool. (Id.) If the hiring process is not

---

[1] Tucker was technically hired by the New York City *Board* of Education. In 2002, Mayor Michael Bloomberg overhauled the organization and renamed it the Department of Education. See Jennifer Steinhauer, The New Schools Chancellor: Overview; Bloomberg Picks a Lawyer To Run New York Schools, N.Y. Times, July 30, 2002, at A1. For simplicity's sake, this Opinion will refer to both the Department of Education and its predecessor as the "DOE."

completed within six months, it must begin again.  (Fay Decl., Ex. B at 53.)

On six occasions beginning a month after Tucker was hired on an interim basis, the DOE initiated the C-30 process by posting Tucker's Drug Director position.  Each time, Tucker received a copy of the posting inviting him to submit an application for the position, and each time he did so.  (Fay Decl., Ex. B at 42-43.)  Each time, however, the C-30 process was suspended before the interview stage, either because there were too few candidates or because the DOE was undergoing reorganization.  (Fay Decl., Ex. B at 45, 48 and Ex. M at 69.) Throughout these abortive attempts to appoint a permanent Drug Director for District Five, and throughout his six years with the DOE, Tucker remained in his position as interim-acting Drug Director.[2]

On July 31, 2002, Tucker wrote to the Chancellor of the DOE, Harold Levy, complaining about the C-30 process and claiming that Thelma Baxter, the departing superintendent, was "once again using her influence and authority to rush the C-30 process so that [Tucker] would be denied fair and unbiased treatment."  (Fay Decl., Ex. H.)  Having received no response, Tucker tried again with Joel Klein, Levy's successor.  On September 20, 2002, Tucker wrote to Klein,

---

[2] Tucker asserts that he actually became tenured three years into his employment.  Tucker contends that, according to New York Education Law, employees acquire tenure automatically ("tenure by estoppel") upon the completion of a three-year probationary period.  (Pl. Mem. 30.) This mischaracterizes the law, which states that all directors must go through a three-year probationary period before achieving tenure. N.Y. Educ. L. § 2573(1)(1).  The law does not provide that directors appointed in an *interim* acting capacity automatically become fully appointed after working for three years.  As Tucker was never appointed as a DOE Drug Director, he never began a probationary period in that position, and therefore did not acquire tenure by estoppel.  Tucker also claims that he was duly appointed Director because the Board of Trustees selected him.  (Pl. Opp'n ¶ 4a.)  Nothing in the record, however, indicates that the approval of the Board of Trustees did anything to change his status as an interim-acting Drug Director.  Indeed, one of Tucker's primary complaints is that he remained in an interim capacity throughout his six years with the DOE.

noting that a friend had recommended that he speak directly to Klein about the C-30 process. (Fay Decl., Ex. I.) In a second letter to Klein, dated June 27, 2003, Tucker complained that Superintendent Dennis Pradier (Baxter's successor) had not responded to Tucker's attempts to contact him about the C-30 process, and that he had been subjected to discrimination as an employee of the DOE. (Fay Decl., Ex. L.) Tucker's letter was forwarded to Pradier, who responded to Tucker by explaining that the C-30 process had been suspended pending DOE reorganization. (Fay Decl., Ex. M.)

In January 2003, Chancellor Klein had announced that, effective July 1, 2003, the DOE would be completely reorganized, with a drastically reduced budget, and the system of individual school districts would be reconfigured into a region-based system. (Fay Decl., Ex. B at 71.) On June 20, 2003, Tucker received a letter from Joyce Coppin, Chief Executive of the DOE, informing him that, as of September 1, 2003, he would be laid off as a result of the reorganization and the attendant severe budget cuts. (Fay Decl., Ex. K.) The DOE had originally intended to eliminate the position of Drug Director entirely in connection with the reorganization. (Fay Decl., Ex. O at 16.) The union to which the Drug Directors belonged, however, managed to negotiate an agreement whereby the DOE would re-hire a number of the Drug Directors, in order of seniority. (Id. 29.) Because Tucker held his position in an interim-acting capacity, however, he had no seniority rights, and was thus vulnerable to layoff. (Fay Decl., Ex. O at 23, 25-26.)

In the fall of 2003, as a result of several retirements, a few Drug Director positions opened up. (Fay Decl., Ex. B at 86.) Tucker applied for the Drug Director position in Region 10, which included the area formerly constituting District 5, where Tucker had been interim-

acting Drug Director.  (Id. 87.)  Tucker was one of five candidates interviewed in December

2003 by Victor Rodriguez, Director of Student Placement, Youth and Family Support Services

("SPYSS") for Region 10.  (Declaration of Victor Rodriguez, dated March, 2008 ("Rodriguez

Decl."), ¶ 7.)

    During this interview, Tucker wore his arm in a cast.  In May 2003, Tucker had

undergone surgery to correct detached ligaments in his right hand and wrist.  (Fay Decl., Ex. R at

15.)  Aside from a few weeks off to recuperate immediately following his surgery, Tucker was

able to continue working, albeit with some help from a colleague when writing became too

onerous.  (Fay Decl., Ex. R at 26-27, 29.)  Tucker contends that Rodriguez inquired about the

cast, and that Tucker replied that he had had an operation, was disabled, and was going to

therapy to regain the use of his hand.  (Fay Decl., Ex. R at 47.)  Tucker also asserts that he

mentioned that he would need secretarial help while recuperating from the effects of his surgery.

(Id.)  The job eventually went to Vivian Figueroa, an able-bodied candidate who, according to

Rodriguez, performed better in her interview, and had stronger references, than did Tucker.

(Rodriguez Decl. ¶¶ 11-12.)

    Tucker promptly filed a grievance through his union, the United Federation of Teachers,

claiming that he was laid off, and not reinstated to a Drug Director position after his layoff,[3]

because of discrimination based on his "whistleblower status."  (Fay Decl., Ex. P.)  Tucker also

claimed he had been subjected to discriminatory treatment because no C-30 process had ever

been completed to appoint him as District 5 Drug Director in a non-interim capacity.  (Id.)  The

---

[3] Although "reinstated" is the word used in the grievance decision, Tucker had never held
the position of fully-appointed Drug Director, so technically he could only have been reinstated
as an interim-acting Drug Director.

Chancellor's Representative denied Tucker's grievance, finding that Tucker had been laid off, and then not re-hired, "because he was neither appointed in title, with concomitant seniority, nor did he possess reversion rights in another license area."[4] (Id.).

On March 8, 2004, Tucker filed a charge of discrimination with the New York State Division of Human Rights ("SDHR"), complaining that the DOE had failed to permanently appoint him to the position of Drug Director and had terminated his employment based on his race and sex. (Fay Decl., Ex. S.) On April 1, 2004, Tucker amended his charge to include an allegation that he not been hired for the Region 10 Drug Director position because of his disability. (Fay Decl., Ex. T.) On October 30, 2004, Tucker's attorney requested a right-to-sue letter from the Equal Employment Opportunity Commission and an administrative-convenience dismissal from the SDHR. On March 11, 2005, after receiving these documents, Tucker commenced the instant action by filing his complaint with the Court. On October 25, 2007, Tucker, who had previously been represented by counsel, filed an amended complaint pro se. On February 8, 2008, plaintiff moved for summary judgment. On March 10, 2008, defendants cross-moved for summary judgment on all of plaintiff's claims.

## DISCUSSION

### I.    Summary Judgment Standard

Summary judgment must be granted where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A

---

[4] Some laid-off Drug Directors, although lacking sufficient seniority to be retained in that capacity, nevertheless remained employed by DOE because they also had tenure as teachers, or in some other capacity. Tucker did not, and thus lacked "reversion rights" to return to another position.

"genuine issue of material fact" exists if the evidence is such that a reasonable jury could find in favor of the non-moving party.  Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001).  To defeat a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  "[I]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

When a party is proceeding pro se, a judge must assess his pleadings by a more generous standard than that accorded to pleadings drafted by lawyers.  Bussa v. Alitalia Linee Aeree Italiane, S.P.A., No. 02 Civ.10296, 2004 WL 1637014, at *4 (S.D.N.Y. July 21, 2004).  Despite this more lenient treatment, a pro se litigant must still meet the threshold requirements to survive a motion for summary judgment.  Id. at *11.  See also Lee v. Coughlin, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (holding that a "pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment" (citing Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991)), reh'g granted on other grounds, 914 F. Supp. 1004 (S.D.N.Y. 1996).

## II.     Race Discrimination

Tucker's amended complaint alleges that the DOE discriminated against him on the basis of his race in violation of § 1981 and under the New York State and City anti-discrimination laws by failing to permanently appoint him to the position of Drug Director.  His summary judgment brief, however, barely alludes to a race discrimination claim, and his opposition to the DOE's motion for summary judgment submits instead a claim of national origin discrimination.

Nevertheless, because it is not clear that Tucker means to abandon his race discrimination claims, and in view of Tucker's pro se status, the Court will address these race discrimination claims.

42 U.S.C. § 1981 provides in relevant part that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." The Second Circuit has held that the elements of a claim for employment discrimination under § 1981 are the same as those of a claim under Title VII.[5] Choudhury v. Polytechnic Inst. of New York, 735 F.2d 38, 44 (2d Cir.1984). Under the burden-shifting analysis outlined for Title VII complaints in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), a plaintiff must first establish a prima facie case of discrimination, by presenting evidence that (1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment action; and (4) there was a preference for a person not of the protected class. Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006). The fourth requirement can be satisfied by showing that the position was ultimately filled by a person who was not a member of the protected class, or that there were other "circumstances giving rise to an inference of discrimination on the basis of plaintiff's membership in that class." Farias v. Instructional Sys., 259 F.3d 91, 98 (2d Cir. 2001).

Tucker is able to satisfy the first three prongs of a prima facie case of race discrimination. As an African-American, Tucker is a member of a protected class. That Tucker was hired as an interim-acting Drug Director is sufficient evidence that he was qualified for the job. Tucker

---

[5] Employment discrimination claims under the state and city human rights laws are also analyzed under the same standards. Weinstock v. Columbia Univ., 224 F.3d 33, 42, n.1 (2d Cir. 2000).

contends that his failure to be fully appointed to the position of Drug Director in District 5 during his six years of employment with the DOE constitutes an adverse employment action. Tucker, however, has failed to show the DOE's preference for a person not of the protected class. Although Tucker was not appointed to a permanent post as Drug Director of District 5, no one else was appointed to the position in his stead. The position was not filled during his incumbency as interim-acting Director, and he was laid off when the position was effectively eliminated.[6]

Even had Tucker made out a prima facie case, the DOE would still be entitled to summary judgment. Under the McDonnell Douglas burden-shifting framework, a defendant may rebut a prima facie showing of discrimination by articulating a legitimate, non-discriminatory reason for the employment decision. Fisher v. Vassar College, 113 F.3d 1332, 1335 (2d Cir. 1998). The defendant "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Texas v. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 257 (1981). When a defendant produces such evidence, the burden shifts back to the plaintiff, who must then persuade the trier of fact that the reason proffered by the defendant is a "pretext," and not "the true reason for the employment decision." Id. at 256. A plaintiff can either do this directly by showing "that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Id. In assessing

---

[6] "A decision not to award a [position] to anyone might be discriminatory where the decision was motivated by discriminatory animus, for example, where all the applicants are members of the protected class." Singleton v. Mukasey, No. 06 Civ. 6588, 2008 WL 2512474, at *4 (June 13, 2008 S.D.N.Y). Tucker does not allege, let alone offer evidence, that that was the case here. As noted, under the C-30 process, the *absence* of sufficient minority or female candidates is a ground for refusing to certify the applicant pool.

whether a plaintiff has been able to prove pretext, courts must be mindful that, "[w]hen a decision to hire, promote, or grant tenure to one person rather than another is reasonably attributable to an honest even though potentially subjective evaluation of their qualifications, no inference of discrimination can be drawn." Lieberman v. Gant, 630 F.2d 60, 67 (2d Cir. 1980). If a plaintiff is unable to show pretext, summary judgment may be granted for the defendant.

The DOE has articulated legitimate, non-discriminatory reasons for its actions. The DOE hiring process requires that specific steps be taken before administrative or supervisory employees may be hired for permanent positions. Tucker offers no evidence that this process, one of whose requirements is that an applicant pool include minority and female candidates, was designed or functioned to disadvantage black candidates.

Nor did the hiring process applied in Tucker's case depart from the mandated procedures. Cf. Zahorik v. Cornell University, 729 F.2d 85, 93 (2d Cir. 1984) ("Departures from procedural regularity . . . can raise a question as to the good faith of the process where the departure may reasonably affect the decision"); Blackstock v. Champlain Enters., No. 03 Civ. 3448, 2004 WL 1616361, at *5 (S.D.N.Y. July 19, 2004) (a departure from established procedures may provide support for an inference of discrimination in some contexts). Three different superintendents, on six different occasions, initiated C-30 processes – processes that might have culminated in Tucker's full appointment – to appoint a permanent District 5 Drug Director. (Fay Decl., Ex. B at 42, 44, 47, 50-52, 55, 57-58, 64, 66.) Although each C-30 process ended before the interview stage, in each case the premature termination was in accordance with regulations. (Fay Decl., Ex. B at 44-45, 48, 53, 56 and Ex. M at 69.) Despite Tucker's claims that he should have been tenured into his position by estoppel, see note 2 above, he had no right to be appointed to the

permanent position of Drug Director without going through the DOE hiring process.

Although it appears to have been unusual for someone hired contemporaneously to Tucker to spend as long as he did in an interim capacity (Fay Decl., Ex. G at 36), Tucker offers no evidence that would permit reasonable jurors to find that the DOE's actions were motivated by racial animus. He does not contend that anyone in the DOE treated him in a racially disparaging manner or showed any sign of racial bias or hostility. Moreover, any inference of race discrimination is further undermined by the fact that all three superintendents under whom Tucker worked as well as three of his four direct supervisors at the DOE were also African-American. (Fay Decl., Ex. B at 31-37, 49, 65.) See Fosen v. New York Times, No. 03 Civ. 3785, 2006 WL 2927611, at *5 (S.D.N.Y., Oct. 11, 2006) (noting that any inference of discrimination is undermined by the fact that the decisionmakers belonged to the same protected class as did the plaintiff).

Nor does Tucker offer statistical evidence that blacks were disproportionately excluded from positions as Drug Director or from other administrative positions with DOE. Tucker contends that "minority males[7] were routinely passed over for permanent appointments" and that "[w]hite females . . . were appointed within one or two years after being hired, while minority males usually took many years to become appointed." (Pl. Opp. ¶ 47b.) As evidence, he offers a copy of the 2003 DOE Education Administrators ("EA") Seniority List, which he has annotated to include the race of each EA – including but not limited to Drug Directors – on the roster. (PX 42.) Assuming without deciding that Tucker's annotations are competent evidence, the list fails

---

[7] In his SDHR complaint, Tucker had charged that he was discriminated against on the basis of sex as well as on the basis of race. (Fay. Decl., Ex. S). He dropped this allegation entirely from both his initial complaint and his amended complaint in this Court.

to support his claim of a pattern of race discrimination.  The list demonstrates no pattern of the exclusion of African-Americans from administrative positions: the list includes twenty-eight fully-appointed EAs, of whom fourteen are white, eleven black, and two Hispanic.[8]  The list also indicates the date on which each EA began work in an interim-acting capacity and the date on which he or she became fully appointed.  Every one of the EAs who was fully appointed after 1990 – including nine whites, seven blacks, and two Hispanics – was either fully appointed from the start or had become so within two and a half years.[9]

There is thus no basis for concluding that the failure to appoint Tucker to a permanent position was the result of racial discrimination.  Accordingly, summary judgment for defendants must be granted on these claims.

### III.    Title VII and § 1981 Retaliation

Tucker also charges that he was retaliated against for complaining of race discrimination in the workplace, in violation of Title VII and 42 U.S.C. § 1981.  Title VII forbids employers from retaliating against an employee who "has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  To establish a prima facie case for retaliation, an employee must show (1) that he engaged in an activity protected under anti-discrimination statutes; (2) that the employer was aware of his participation in the protected activity; (3) that the employer took adverse action

---

[8] The race of one of the fully appointed EAs listed is unclear from the record.   The list also includes four additional Directors who (like Tucker) were serving in an interim-acting capacity and are therefore at the bottom of the seniority list.  The race of these other interim-acting Directors is unclear from the record.  (PX 42.)

[9] The information regarding hiring dates for the seven pre-1990 EAs, four of whom are black and three white, is incomplete.

against him; and (4) that a causal connection existed between the employee's protected activity and the adverse action taken by his employer. Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993). The same standard is applied under § 1981. Taitt v. Chemical Bank, 849 F.2d 775, 777 (2d Cir. 1988).

Tucker meets the first three of these criteria. He engaged in activity protected under the anti-discrimination statutes by writing a letter on June 27, 2003, to Chancellor Klein, detailing the "corruption of the Chancellor's C-30 process" and referring – albeit only in the most general terms – to "discriminatory practices against [him]." (Fay Decl., Ex. I.) The DOE was aware of that letter, as it was sent to Chancellor Klein, the head of the entire organization. And it can be assumed, for purposes of this motion, that Tucker's failure to be appointed to a permanent position in District 5, his layoff, and his failure to be reappointed as an interim acting Drug Director were adverse employment actions.

Nevertheless, Tucker has failed to make out a prima facie case of retaliation with regard to his failure to be fully appointed and his termination. Tucker has presented no evidence tending to show that there was a causal connection between his protected activity and his failure to achieve permanent status or his layoff. Nothing in the record indicates that Tucker alleged race discrimination at any point before any of the abortive C-30 processes or before he had received notice of his termination on June 20, 2003. Tucker wrote letters complaining about the C-30 process to Chancellors Levy and Klein before his termination but these letters make no allegations of race discrimination. (Fay Decl., Ex. H. and I.) To the extent that Tucker's second letter to Klein constituted protected activity, that letter came *after* Tucker had been laid off from his interim position. Moreover, as discussed above in Part II, the failure to appoint Tucker to a

permanent position was the result of objective regulatory requirements that cannot have been affected by any invidious motivation on the part of anyone at DOE.[10]

Tucker has thus failed to make a prima facie showing that defendants took adverse action against the plaintiff based on his protected activity. Summary judgment for the defendants on this claim is therefore appropriate.

## IV.    National Origin Discrimination

In his Opposition to Defendants' Motion for Summary Judgment, Tucker raises for the first time a claim that he was discriminated against on the basis of his national origin. Tucker's mother is of Cape Verdean descent (PX 33, Declaration of Art Smith, dated April 28, 2008), and Tucker contends that blacks having that ethnic origin are often subject to hostility from other African-Americans. At the outset, it is inappropriate for the Court to entertain a claim that has been raised for the first time in a submission in opposition to summary judgment. Bonnie & Co. Fashions, Inc. v. Bankers Trust Co., 170 F.R.D. 111, 119 (S.D.N.Y. 1997). As Tucker did not assert any claim of national origin discrimination in either his initial or his amended complaint, defendants have had no fair opportunity to take discovery with respect to this claim.

Moreover, even if the claim had been properly alleged in Tucker's complaint, Tucker could not claim national origin discrimination under Title VII, as he did not include any such charge in presentations to the Equal Employment Opportunity Commission ("EEOC") or the SDHR. Such an administrative complaint is a prerequisite to any claim of discrimination under

---

[10] To the extent that Tucker claims that his failure to be rehired after his layoff was retaliatory, he fares no better. Tucker offers no evidence to contradict the DOE's assertion that Tucker lost his position due to a decision to eliminate the position throughout the system, followed by a rote application of seniority and tenure standards. There is no evidence from which a reasonable fact-finder could conclude that these overtly neutral bases of decision were pretexts for illegal retaliation.

Title VII.  Butts v. New York Dep't of Hous. Preservation & Dev., 990 F.2d 1397, 1401 (2d Cir.

1993).  Nor can Tucker assert that a claim of national origin discrimination was fairly

encompassed within his administrative charge of race discrimination.  The Second Circuit has

allowed claims not raised in the charge to be brought in a civil action where the conduct

complained of would fall within the "scope of the EEOC investigation which can reasonably be

expected to grow out of the charge of discrimination."  Id. at 1402 (quoting Smith v. American

President Lines, Ltd., 571 F.2d 102, 107 n.10 (2d Cir. 1978)).  In this case, however, the

anti-discrimination agencies can hardly have been expected to intuit such an unusual claim of

national origin discrimination when presented with an apparently straightforward charge of race

and sex discrimination.

Finally, even if these procedural obstacles were not fatal, no reasonable jury could

conclude that the DOE made its employment decisions based on any discriminatory animus

toward Tucker's national origin.  For the same reasons discussed in Part II above, Tucker is

unable either to make out a prima facie case of national origin discrimination or to demonstrate

that the DOE's non-discriminatory explanations for its actions are mere pretext.  As a pure

question of law, Tucker is correct that a claim of national origin discrimination perpetrated by

one African-American against another can form the basis of a valid Title VII complaint.  Such a

complaint, however, must be based on evidence to survive summary judgment.  Tucker offers

none, resting his claim solely on his own conclusory assertion that the actions of two of his

African-American supervisors were "clearly ethnically based."  (Pl. Opp'n ¶ 37.)  Summary

judgment for the defendants must therefore be granted on plaintiff's national origin

discrimination claim.

## V.     Disability Discrimination

Tucker alleges that the DOE discriminated against him on the basis of his disability when it declined to hire him for the Region 10 position in the fall of 2003.[11]  The claim is without merit.

In order to establish a prima facie case of discrimination under the ADA, a plaintiff must show (a) that his employer is subject to the ADA; (b) that he is disabled within the meaning of the ADA or perceived to be so by his employer; (c) that he was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (d) that he suffered an adverse employment action because of his disability.  Jacques v. DiMarzio, Inc., 386 F.3d 192, 198 (2d Cir. 2004).  The DOE does not contest that it is subject to the ADA or that Tucker was otherwise qualified to perform the essential functions of the job for which he applied.  Defendants argue, however, that Tucker is not disabled within the meaning of the ADA.

The ADA defines a disability as: (1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment.  42 U.S.C.S. § 12102(2).  The record contains evidence from which a reasonable jury could conclude that Tucker had a physical impairment in the form of a hand and wrist injury.  (PX 47.)  The DOE contends, however, that this physical condition did not substantially limit one of Tucker's major life

---

[11] Tucker's original complaint, prepared by counsel, did not allude to any claim of disability discrimination.  Although his amended complaint, prepared pro se, makes a catch-all claim of disability discrimination in regard to his "employment application, hiring, discharge, compensation and other terms, conditions and privileges of employment" (Am. Compl. ¶ 28), Tucker's deposition testimony clarifies that he is not alleging that either his failure to be appointed to a permanent position in District 5, or his layoff from the interim post, were attributable to disability discrimination.  (Fay Decl., Ex. R at 45-46.)  Rather, this claim is restricted to his failure to be hired for the Region 10 position.  (Id.)

activities.  In determining whether a major life activity has been "substantially limited," courts

have considered the following factors: "the nature and severity of the impairment; the duration or

expected duration of the impairment; and the permanent or long-term impact, or the expected

permanent or long-term impact of or resulting from the impairment."  Toyota Motor Mfg., Ky. v.

Williams, 534 U.S. 184, 196 (2002) (quoting EEOC guidelines at 29 C.F.R. §§

1630.2(j)(2)(i)-(iii)).  As for which activities qualify as "major life activities," the EEOC has

defined the phrase to include caring for oneself, performing manual tasks, walking, seeing,

hearing, speaking, breathing, learning, and working.  29 C.F.R. § 1630.2(i).

For a few months immediately following his hand surgery, Tucker was unable to perform

manual tasks or care for himself without the assistance of a home aide.  (Fay Decl., Ex. R at 32.)

This inability to care for himself without a home aide was not in itself "substantially limiting"

because the extent of this impairment was temporary; Tucker's condition has since improved

such that the only thing he remains unable to do is participate in certain recreational sports.  (Fay

Decl., Ex. R at 39.)  Cf. Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 646 (2d Cir.

1998) (an injury which required a seven month leave of absence from work was too short in

duration to be substantially limiting).

Tucker also argues that he was disabled for purposes of the ADA in that his injury has

limited his ability to perform the major life activity of working – at least without the

accommodation of secretarial help.  Although the Supreme Court has reserved judgment as to

whether working is a major life activity under the ADA, Sutton v. United Air Lines, Inc., 527

U.S. 471, 492 (1999), the Second Circuit has accepted the EEOC regulations that define "major

life activities" to include working.  See Bartlett v. New York State Bd. of Law Exam'rs, 226

F.3d 69, 83 (2d Cir. 2000). Because the record does not sufficiently indicate the duration or permanency of Tucker's inability to work without accommodation, it is unclear whether Tucker can make out a prima facie case of disability discrimination.

Even assuming the facts in Tucker's favor, defendants have satisfied the second step of the <u>McDonnell Douglas</u> burden-shifting framework by articulating legitimate, non-discriminatory reasons for declining to hire Tucker. Victor Rodriguez, Director of SPYSS for Region 10, testified that, during his job interview, Tucker did "not seem to embrace a leadership style emphasizing consensus-building or teamwork." (Rodriguez Decl. ¶ 8.) Rodriguez also believed that Tucker was "disinterested in making follow-up visits" to counselors in the field or otherwise participating in on-site program assessments. (<u>Id</u>.) Furthermore, after the interview, Rodriguez contacted Dennis Pradier, a superintendent under whom Tucker had worked as an interim-acting Drug Director in District 5. Pradier told Rodriguez that he had found Tucker "difficult to work with" and that Tucker had an "abrasive style." (Rodriguez Decl. ¶ 10.) By contrast, Vivian Figueroa, the candidate Rodriguez eventually selected, appeared from her interview to have "excellent inter-personal skills," an "inclusive approach to problem solving" and to better fit Rodriguez's vision for the leadership style required by the Drug Director position. (Rodriguez Decl. ¶ 11.) Additionally, Figueroa's former supervisor had "high praise for her work and leadership style." (Rodriguez Decl. ¶ 12.)

Tucker contends that the DOE's proffered reasons are pretextual, but he fails to adduce evidence sufficient to create a genuine issue of material fact. Tucker testified that, during the interview, Rodriguez inquired about the cast Tucker was wearing and Tucker replied that he had had an operation, was disabled, was going to therapy to regain the use of his hand, and that he

would need secretarial help during that time because of the effects of his surgery. (Fay Decl., Ex. R at 47.) Tucker also testified that Rodriguez looked at his cast and said "if you get your job back, then you'll be able to get your benefits and your back pay." (Id.)[12] Rodriguez's mere awareness of Tucker's disability, however, is not enough to rebut the legitimate and nondiscriminatory explanation proffered by the defense. Tucker offers no evidence that Rodriguez viewed Tucker's disability or need for accommodation in any sort of negative light.[13]

As Tucker offers no evidence that defendants' nondiscriminatory reasons for its decision were pretextual, summary judgment will be granted to the defendants on plaintiff's ADA claim.

## VI. First Amendment Retaliation

Tucker alleges that the DOE retaliated against him for speaking out on matters of public concern by failing to fully appoint him as a Drug Director, by laying him off, and by failing to rehire him after his termination.

To state a prima facie claim of First Amendment retaliation under § 1983, a plaintiff must demonstrate by a preponderance of the evidence that (1) his speech was constitutionally protected, (2) he suffered an adverse employment action, and (3) the speech was a motivating factor for the adverse employment action. See Morris v. Lindau, 196 F.3d 102, 110 (2d Cir.

---

[12] Rodriguez disputes Tucker's account, testifying that he was "not aware that Mr. Tucker suffered from any sort of alleged physical ailment that limited the range of motion of his right wrist and hand." (Rodriguez Decl. ¶ 13.) For purposes of this motion, this Court must take the facts in the light most favorable to Tucker, and therefore assumes the truth of Tucker's account.

[13] Tucker also asserts that the DOE's explanation is pretextual because Figueroa lacked the necessary licensure for the position of Drug Director. Tucker's assertion is factually incorrect. At the time Figueroa was appointed as Drug Director of Region 10, she possessed a licence 009B, which was the license requirement for the position of Drug Director. (Declaration of Carol Labozzetta, dated March 7, 2008.) Tucker offers no admissible evidence to rebut the documentary proof submitted by the DOE.

1999). Causation can be established either directly by evidence of retaliatory animus or indirectly by circumstantial evidence such as a showing that the protected activity was followed in close temporal proximity by an adverse employment action. See Sumner v. United States Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990). If a plaintiff establishes these three factors, the defendant has the opportunity to show by a preponderance of the evidence that it would have taken the same employment action "even in the absence of the protected conduct." Morris, 196 F.3d at 110.

Much of Tucker's self-proclaimed "whistleblowing" does not rise to the level of constitutionally protected speech. For speech to be protected under the First Amendment, it must pertain to a "matter of political, social or other concern to the community." Connick v. Myers, 461 U.S. 138, 146 (1983)). Whether a particular instance of speech relates to a matter of public concern is a question of law which the court must determine by examining "the content, form, and context of a given statement, as revealed by the whole record." Id. at 148. The court should then attempt to discern whether the speech was calculated to redress personal grievances or whether it had a broader public purpose. See Lewis v. Cowen, 165 F.3d 154, 163-64 (2d Cir. 1999). The key inquiry is whether the plaintiff made his statements primarily as a "disgruntled employee or . . . as a concerned citizen." Hanig v. Yorktown Cent. Sch. Dist., 384 F. Supp. 2d 710, 722 (S.D.N.Y. 2005). If an employee's speech is focused on matters personal to the employee, the speech cannot be classified as being on a matter of public concern and the government, acting as an employer, "has greater latitude to discipline" the employee. Connick, 461 U.S. at 146. "The requirement is not that the plaintiff have absolutely no personal interest; rather, that personal interest may not be the overriding one." Grennan v.

20

<u>Nassau County</u>, No. 04 Civ. 2158, 2007 WL 952067, at *8 (E.D.N.Y. Mar. 29, 2007).  <u>See also</u>

<u>Johnson v. Ganim</u>, 342 F.3d 105, 114 (2d Cir. 2003).

Tucker asserts that he was retaliated against for speaking out against corruption in School District 5.  On July 31, 2002, Tucker sent a letter to Chancellor Levy to express his frustration with the way the C-30 process had been handled vis-à-vis his own application.  Tucker did write at the end of this letter that "it would seem to me that District 5 is utilizing [the C-30 process] to deny eligible candidates who do not support a corrupt and sometimes narrow political agenda the opportunity of a job with District 5.  There are several instances where supervisors already in positions in District 5 lost their jobs due to cronyism and biased C-30 procedures."  (Fay Decl., Ex. H.)  Taken in isolation, at least a portion of this last paragraph could be read as speaking to matters of public concern.  But examining the "content, form, and context" of the statement, as the Supreme Court instructs courts to do, <u>Connick</u>, 461 U.S. at 148, Tucker's passing references to a "corrupt and sometimes narrow political agenda" and "cronyism" serve merely to buttress Tucker's complaint on a matter of purely personal concern – his contention that Superintendent Baxter was "using her influence and authority to rush the C-30 process so that [Tucker] would be denied fair and unbiased treatment."  (Fay Decl., Ex. H.)

Tucker also sent two letters to Chancellor Klein.  In the first, dated September 20, 2002, he notes that a friend had recommended that he speak directly to Klein about the C-30 process. (Fay Decl., Ex. I.)  In his June 27, 2003, letter to Chancellor Klein, Tucker expresses frustration (1) that he had not been able to get Dennis Pradier, the then-Superintendent, to return his calls, (2) that he had had to apply for the Drug Director position multiple times only to have the C-30 process cancelled each time, and (3) that he had been subjected to discrimination.  (Fay Decl.,

Ex. L.)  The letters to Klein raise only Tucker's own personal situation and thus do not address matters of public concern.

The record includes one other letter, which Tucker sent to William Modzeleski, Director of the Office of Elementary and Secondary Education in Washington, D.C., on June 18, 2002. (PX 12.)  In that letter, Tucker asks for Modzeleski's assistance with "some serious concerns [Tucker has over his] Project Decision budgets . . . and the apparent mishandling of funds by the Business Office of School District #5."  (Id.)  The letter concludes by "formally requesting that [Modzeleski's] office contact the Inspector General and put in a request to investigate the above mentioned crisis in Community School District #5."  (Id.)  The letter does qualify as constitutionally protected speech and thus satisfies the first prong of a prima facie First Amendment retaliation claim.  Tucker also satisfies the second prong, as there is no dispute that he was never fully appointed as a Drug Director and that he was terminated from, and then not rehired to, his interim-acting Drug Director position.

To prevail, however, Tucker also needs to demonstrate that his speech was a motivating factor for the adverse employment action.  Tucker has not offered any evidence that anyone at the DOE knew of his letter to Modzeleski.  Even assuming that the DOE did have knowledge of Tucker's protected speech, Tucker offers no plausible evidence that the DOE's actions were pretextual.  For the reasons discussed in Part II above, Tucker is unable to demonstrate that the DOE's non-discriminatory explanations for its failure to appoint him to a permanent Drug Director position or for his termination and failure to be rehired are pretextual.

As Tucker is unable to make out a prima facie claim of First Amendment retaliation, summary judgment will be granted to the defendants.

## VII. Section 1985 Conspiracy

Finally, Tucker's complaint adds a catch-all cause of action alleging that the defendants conspired to deny him his constitutional rights in violation of 42 U.S.C. § 1985.

In order to make out a conspiracy claim under § 1985(3), a plaintiff must allege: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. Gray v. Town of Darien, 927 F.2d 69, 73 (2d Cir. 1991). Broad allegations of conspiracy will not suffice; instead, a plaintiff "'must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end.'" Raghavendra v. Trs. of Columbia Univ., No. 06 Civ. 6841, 2008 WL 2696226, at *9 (S.D.N.Y. July 7, 2008) (quoting Romer v. Morgenthau, 119 F. Supp.2d 346, 363 (S.D.N.Y. 2000)).

Tucker asserts that there was a "pervasive collusion among high level Administrators, including the Community Superintendent, in School District 5, to discredit, malign, and destroy the Plaintiff's character and reputation." (Pl. Mem.6.) He fails, however, to allege any specific agreement or meeting of the minds among defendants. Moreover, the Second Circuit has applied to § 1985(3) cases the doctrine that there can be no conspiracy if the conspiratorial conduct challenged is essentially a "single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment." Hermann v. Moore, 576 F.2d 453, 459 (2d Cir. 1978). Every defendant in this action was employed by the DOE and was acting in his or her capacity as a DOE employee in connection with the alleged

conspiracy. Finally, for the reasons stated above, Tucker has failed to present a triable issue that any of the employment decisions in question was discriminatory, or violated his rights in any way. His vague allegations of a conspiracy to "discredit" or "malign" him cannot substitute for the specific claims in his complaint, which relate to the hiring process and which are without merit.

As Tucker has failed to allege an actionable conspiracy, summary judgment for the defendants must be granted on plaintiff's § 1985 claim.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is denied.

Defendants' motion for summary judgment is granted with respect to all claims.

SO ORDERED.

Dated: New York, New York
September 30, 2008

GERARD E. LYNCH
United States District Judge

24